IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MICHAEL FEHRENBACHER, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>-against-<br><br>XYBERNAUT CORPORATION, EDWARD G. NEWMAN, STEVEN A. NEWMAN, M.D., AND THOMAS D. DAVIS,<br>Defendants. | Civil Action No. _____<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT
## FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Plaintiff, by his attorneys, for his complaint against defendants, alleges upon personal knowledge with respect to paragraph 2, and upon information and belief based, inter alia, upon the investigation of counsel, as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.      This action is brought by Plaintiff, under the federal securities laws, individually and on behalf of a class of purchasers of the common stock of defendant Xybernaut Corporation ("Xybernaut" or the "Company") to recover damages caused by Defendants' violations of the federal securities laws.

### PARTIES

2.     Plaintiff, as set forth in his attached certification, which is incorporated here by reference, purchased shares of Xybernaut common stock in the open market between March 27, 2003, and April 19, 2005, inclusive, and suffered damages as a result of those purchases.

3.     Defendant Xybernaut is a corporation duly organized and existing under the laws of the State of Delaware. Xybernaut has its principal executive offices and headquarters at 12701 Fair Lakes Circle, Fairfax, Virginia.

4.     Defendant Edward G. Newman ("E. Newman"), at all times relevant hereto, was Xybernaut's Chief Executive Officer ("CEO") and Chairman of the Board of Directors.

5.     Defendant Steven A. Newman, M.D. ("S. Newman") was Xybernaut's President beginning on or about May 1, 2003 and was, at all times relevant hereto, Xybernaut's Chief Operating Officer ("COO"), and Vice-Chairman of the Board. Defendant S. Newman is the brother of Defendant E. Newman.

6.     Defendant Thomas D. Davis was named as the Company's Chief Financial Officer ("CFO") and Senior Vice-President on or about November 14, 2002, and resigned as an executive officer of the company on or about November 8, 2004.

7.     The defendants named in paragraphs 4 to 6 are collectively referred to herein as the "Individual Defendants".

## JURISDICTION AND VENUE

8.     Jurisdiction is proper in this Court under §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §§1331.

9.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§78j(b) and 78t(a) (the "Exchange

Act") and Rule 10b-5, (17 C.F.R. §240.10b-5), promulgated thereunder by the Securities and Exchange Commission ("SEC").

10.    Venue is proper under the provisions of the Exchange Act and 28 U.S.C. 1391(b) because Defendant is incorporated within the District of Delaware.

11.    In connection with the acts, conduct and other wrongs complained of herein, the Defendants used the means and instrumentalities of interstate commerce, including the mails, telephone communications and the facilities of the national securities exchanges.

## CLASS ALLEGATIONS

12.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class (the "Class") consisting of all persons who purchased shares in the Xybernaut between March 27, 2003 and April 19, 2005, inclusive (the "Class Period"). Excluded from the Class are the defendants herein, members of each Individual Defendant's immediate family, any entity in which any defendant has a controlling interest, and the legal affiliates, representatives, heirs, controlling persons, successors, and predecessors in interest or assigns of any such excluded party.

13.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, thousands of members of the Class who traded during the Class Period. Xybernaut had millions of shares outstanding during the relevant time period.

-3-

14. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

> a. whether the federal securities laws were violated by Defendants' acts as alleged herein;
>
> b. whether Defendants issued false and misleading statements during the relevant time period;
>
> c. whether Defendants acted knowingly or recklessly in issuing false and misleading statements;
>
> d. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

15. Plaintiff's claims are typical of the claims of the members of the Class, as Plaintiff and members of the Class sustained damages arising out of defendants' wrongful conduct in violation of federal law as complained of herein.

16. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation. Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

17. A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the

Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

18.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine, in that:

        a.   defendants made public misrepresentations or failed to disclose material facts during the relevant time period;

        b.   the omissions and misrepresentations were material;

        c.   the securities at issue here traded in an efficient market; and

        d.   the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the securities at issue here resulting in Plaintiff and members of the Class exchanging their securities.

19.     Based upon the following, Plaintiff and members of the Class are entitled to the presumption of reliance upon the integrity of the market.

## FACTUAL ALLEGATIONS

20.     Xybernaut was originally incorporated in 1990. Xybernaut researches, develops, manufactures, markets and sells mobile/wearable computing and communication systems as well as software and service solutions.

21.     On March 27, 2003, the Company issued a press with its results for the quarter and year ending December 31, 2002:

> Total revenues for 2002 were $10.0 million, a 2% increase over 2001. These results include a 17% increase in 2002 hardware revenues to $6.1 million. Total revenues for the fourth quarter ended December 31, 2002 were $2.6 million,

representing an increase of approximately 2% over revenues during the third
quarter of 2002.

Net operating expenses for the fourth quarter of 2002 were $4.5 million, a
reduction of 56% from the fourth quarter of 2001 and 26% from the third quarter
of 2002. Net operating expenses exclude restructuring and certain other non-
recurring charges and are discussed in further detail below. Net loss for 2002
decreased 17% from $32.2 million, or $0.63 per share, for 2001 to $26.6 million,
or $0.37 per share, for 2002.

22.    In this press release, Mr. Davis stated that "I am very pleased to announce that
Xybernaut has surpassed our previously stated targets related to reductions in operating
expenses, as evidenced by the 56% decline in net operating expenses for the fourth quarter of
2002 over the comparable 2001 period," and that "[a]dditionally, we have recently been
successful in eliminating a considerable amount of long-term liabilities and commitments
relating to both product and inventory."

23.    In the press release, Mr. E. Newman stated that "Xybernaut continues to
achieve considerable success despite challenging market conditions," that "[w]e continue to
strengthen our intellectual property, as evidenced through recent announcements of patent
grants and an aggressive new licensing strategy," that "[w]e have reorganized our
management structure and strengthened our corporate governance through the appointment
of two new independent directors to our board," and that "we are amongst a small number of
technology companies actually deploying comprehensive solutions into first responder and
homeland security communities."

24.    On March 26, 2003, before the Company's press release regarding its 2002
results, 740,500 shares of the Company's stock were traded and the stock closed at $0.42 per

share. On March 27, 2003, approximately 1.9 million of the company's shares were traded, and the company's stock closed at $0.37 per share.

25.    On March 28, 2003, the Company released its annual report for the fiscal year ended December 31, 2002. This report was signed by the Individual Defendants and contained the financial information of the March 27th press release.

26.    On April 2, 2003, the company issued another press release regarding information in its annual report. In the press release, the company stated that it had "raised $6.1 million through a $2.0 million private placement of common stock with institutional investors, a long-term borrowing of $1.75 million and exercises of approximately $2.4 million of previously issued warrants the company." In the press release, Mr. E. Newman stated that "Xybernaut continues to raise capital under favorable terms despite challenging market conditions," that "[a]s our recent 2002 results emphasize, the Company is achieving considerable accomplishments while utilizing far fewer resources," and that "[t]his funding, combined with recent efforts to cut operating expenses, improves our capital structure, enables us to meet current NASDAQ listing requirements and allows us to continue to focus on long-term growth."

27.    On April 3, 2003, more that 4.8 million shares of the Company's stock were traded, and the Company's stock closed up at $0.45 per share.

28.    On May 1, 2003, the Company announced that the Board had named Dr. S. Newman the President of the company, a position previously held by Mr. E. Newman. Mr. E. Newman remained as CEO and Chairman.

29.     On May 15, 2003, Xybernaut issued a press release announcing its results for

the first quarter of 2003:

> Total revenues for the three months ended March 31, 2003 were $1.8 million, a
> 36% decrease from the comparable period in 2002. Total operating expenses for
> the first quarter of 2003 were $4.2 million, a reduction of 52% from the first
> quarter of 2002 and 59% from the fourth quarter of 2001.
>
> As a result of the Company's cost cutting initiatives, the net loss for the first
> quarter of 2003 decreased 33% to $5.4 million, or $0.04 per share, from $8.0
> million, or $0.13 per share, in the first quarter of 2002.

30.     In this press release, Dr. S. Newman stated that "[w]hile we are not pleased

with the revenue results for the first quarter, we were able to significantly reduce both

operating expenses and net loss," that "[t]hese significant accomplishments were the result

of a combination of factors including reductions in headcount and other cost-cutting efforts,"

and that "[o]ur revenue results were impacted by orders that were delayed in the first quarter,

a sluggish economy and a continued slowdown in technology spending. Nonetheless, I take

complete responsibility for our results and I am resolved to both significantly grow revenues

and increase shareholder value."   Mr. E. Newman added that "[w]e continue to see

significant benefits from our restructuring and cost cutting efforts, surpassing our stated goal

to reduce operating expenses by 50% over prior levels, and we expect the second quarter to

be one of our best ever."

31.     On May 15, 2003, in response to the earnings announcement, more than 4.5

million shares of the Company's stock were traded and the stock closed down at $0.41.

32.     The company also filed its Form 10-Q with the financial results for the first quarter of 2003 on May 15, 2003. This document was signed by the Individual Defendants and contained the financial information described in the May 15, 2003, press release.

33.     On June 19, 2003, the Company issued a press release announcing that it had "recently completed financings totaling approximately $7.75 million through private placements of its common stock and the exercise of outstanding warrants." In this press release, Dr. S. Newman stated that "[t]his financing strengthens our cash position and will allow us to aggressively pursue new business opportunities and partnerships," that "[w]e also will use portions of the proceeds from the financing for product development, focused sales and marketing initiatives and debt reduction," and that "[w]hen combined with our recent reductions of operating expenses, the completion of this financing allows the company to focus on near term milestones and long term growth."

34.     On July 9, 2003, the Company issued a press release stating "[t]hat it expect[ed] revenue for the second quarter ended June 30, 2003 to increase more than 50% compared to revenue for the first quarter of 2003" and that "[t]his would be the highest quarterly percentage increase since the Company's acquisition of Xybernaut Solutions Inc. in 2000."

35.     In the press release, Dr. S. Newman stated that "[t]hese results reinforce our previous expectations that the second quarter would be a pivotal quarter in setting the stage for the Company's future," and that "[b]ased on what we have seen in the second quarter and the first few days of the third quarter, we anticipate increased momentum and success through 2003 and beyond." The press release stated that "Newman noted that this optimism

-9-

is based on the objective measurement of numerous strategic Company initiatives including:

cost-cutting programs; beneficial financings; intellectual property licensing strategies;

strategic partnerships and the securing of key accounts in the transportation, retail, military

and homeland security sectors."

    36.     On July 9, 2003, the Company's stock traded over 33 million times and closed

at $0.71 per share. On July 8, 2003, prior to the announcement, less that 2 million shares of

the Company's stock had been traded and the Company stock closed at $0.57 per share.

    37.     On August 11, 2003, the Company announced:

> that total revenue for the second quarter of 2003 (three months ended June 30) was
> $2.8 million, a 56% increase from the preceding first quarter of 2003, and a 38%
> increase from the comparable period in 2002.

> As of June 30, the Company had no long-term debt, a stockholders' equity balance
> of over $11 million and more than $5 million of cash on-hand. Subsequent to June
> 30, the Company also reported that it had raised an additional $3 million through
> warrant exercises.

> Hardware revenue for the second quarter of 2003 was $1.8 million, a 115%
> increase from the first quarter of 2003 and a 53% increase from the second quarter
> of 2002.

> Gross margin from hardware sales increased to 33% for the three months ended
> June 30, 2003 as compared with 12% for the three months ended June 30, 2002.
> Margin for consulting and other sales increased to 38% in the second quarter of
> 2003 versus 34% in the second quarter of 2002.

> The net loss for the second quarter of 2003 decreased over 50% to $3.3 million
> from the second quarter of 2002. The net loss per share also decreased to $0.02
> per share from $0.10 per share in the prior year.

    38.     In the Company's press release, Dr. S. Newman stated that "[t]he Company is

moving in the right direction in virtually all areas. We are pleased with our second quarter

results and especially the record revenue levels that we achieved. We are determined to do

even better on all fronts as we move forward and my outlook remains highly positive." Mr. Davis stated that "[w]e have continued our cost cutting efforts into 2003, streamlined operations and, with significant cash on-hand we now believe that we have more than enough capital to last us through the end of the year,."

39.     Based on this news, on August 11, 2003, trading volume in the Company's stock was 19.7 million, and the stock closed at $0.80 per share.

40.     On August 13, 2003, the Company filed its financial results for the second quarter of fiscal year 2003 with the SEC on a Form 10-Q. The document was signed by the Individual Defendants and stated the financial information contained in the August 11th press release.

41.     On September 10, 2003, the Company announced that it had "been awarded a $1.62 million purchase order from the U.S. Department of Defense to provide an assessment of wearable computing technologies and solutions for select U.S. military aircraft and air defense maintenance systems." On September 10, 2003, the company's stock closed up at $1.25 per share and over 51 million shares were traded.

42.     On September 15, 2003, the Company announced a hardware contract with the Department of Defense. Trading volume on September 15, 2003, was over 33 million shares, and the Company's stock closed up at $1.60 per share.

43.     On September 29, 2003, Xybernaut announced that it had "completed a private placement of common stock with institutional investors for approximately $7 million." Mr. Davis stated that "[t]hese financings were executed with favorable terms and help us achieve what I consider to be the Company's strongest financial position since the

initial public offering," and that "[w]e have a strong cash position, maintain no debt and continue to keep our operating expenses at a low level." Mr. E. Newman stated that "[w]e've seen positive results in recent quarters from our sales, marketing and business development efforts; we've introduced new and innovative products; we've secured important patents while aggressively protecting our intellectual property; and we are involved in numerous business ventures with key partners," and that "[b]y taking advantage of this opportunity to strengthen our capital structure, Xybernaut is in a better position than ever to extend our recent positive momentum and continue to deliver the results that our customers and stakeholders deserve."

44.    On November 13, 2003, the Company announced its results for the third quarter of fiscal year 2003:

> [T]otal revenue for the third quarter of 2003 (three months ended September 30) was $2.7 million, a 6% increase from the same period in 2002. These results represent the second highest levels of both U.S. revenues as well as worldwide consulting revenues in the Company's history.
>
> Net operating expenses for the three months ended September 30, 2003 declined for the seventh consecutive quarter to $3.8 million. This represents a reduction of over 62% from the fourth quarter of 2001 and a 36% reduction from the third quarter of 2002.
>
> ...At September 30, the Company had no long-term debt, record quarter-end cash of over $13 million and record stockholders' equity of over $17 million.
>
> The net loss for the third quarter of 2003 decreased 41% to $4.7 million from the third quarter of 2002. The net loss per share also decreased to $0.03 per share from $0.10 per share in the prior year.

45.    In the November 13, 2003, press release, Dr. S. Newman stated that the Company's "future has never looked brighter."

46.    On November 13, 2003, the Company also filed a 10-Q with its financial results for the third quarter of fiscal year 2003. This document was signed by the Individual Defendants and contained the financial information included in the November 13th press release.

47.    On January 8, 2004, the Company announced that "it expect[ed] revenues for the fourth quarter and the year ended December 31, 2003 to be at record levels." The Company's press release also contained a statement by Mr. E. Newman:

> I am proud to announce that Xybernaut expected revenues will surpass all historical results. ...I stated earlier that I was very optimistic about our Q4 results and I view today's announcement as just the latest validation of the many strategic initiatives we have undertaken. Management firmly believes that the best is yet to come and we expect to extend the positive momentum the Company is currently experiencing.

48.    On March 9, 2004, Xybernaut announced its financial results for fiscal year 2003. The press release was captioned "Record Revenues, Solid Financial Position and International Momentum Underscore Strongest Year in Company History." According to the press release,

> The Company recorded its highest quarterly revenue ever during the fourth quarter of 2003. Revenue for the quarter ended December 31, 2003 was $3.7 million, a 43% increase over the fourth quarter of 2002 and a 38% increase over the third quarter of 2003. Total revenue for the full year 2003 increased 10% to $11.0 million, compared to $10.0 million for 2002. These year-end results include the highest levels of both product and consulting services revenues in the Company's history.
>
> The Company's net loss for the fourth quarter of 2003 was $5.3 million compared to a loss of $4.0 million in the comparable quarter of the prior year. The net loss

for the entire year ended December 31, 2003 was $18.6 million compared to a loss of $26.6 million for 2002.

At December 31, 2003, the Company had no long-term debt, cash of $9.5 million and stockholders' equity of $15.9 million.

"The management and staff at Xybernaut have never been more focused," said Edward G. Newman, chairman and CEO of Xybernaut. "From record revenues, no debt and strong financial fundamentals; to growing demand from existing and new customers; to recent international successes, we are achieving on every level. Building on these achievements, management continues to be optimistic and encouraged by the prospects for 2004 and beyond."

49.     On March 9, 2004, over 7 million shares of Xybernaut stock were traded, and

the stock closed at 1.58 per share.

50.     On March 12, 2004, the Company filed its 10-K, detailing its financial results

for the fiscal year 2003, and the fourth quarter of that fiscal year. This document was signed

by the Individual Defendants and contained the financial information stated in the March 9th

press release.

51.     On May 4, 2004, the Company issued a press release stating that:

[T]otal revenue for the first quarter ended March 31, 2004 was $4.4 million, a 146% increase over the comparable 2003 period. Hardware revenue for the first quarter of 2004 totaled $2.9 million, increasing 256% from the first quarter of 2003.

This represents the Company's second consecutive quarter of record revenue. Last quarter, the period ended December 31, 2003, the Company reported revenue of $3.7 million, a 43% increase in revenue over the fourth quarter of 2002.

As of the end of the first quarter 2004, the Company had no long-term debt, cash of $12.5 million and record stockholders' equity of $18.3 million.

"We are pleased to announce back-to-back quarters with record revenue and strong year-to-year revenue growth," said Edward G. Newman, chairman and CEO of Xybernaut. "This strong momentum helps validate our belief that the

more widespread adoption of wearable/mobile technologies is happening now. Our products and solutions are being deployed today and they are being deployed in record numbers. With low expenses and our losses decreasing, I continue to remain optimistic and positive about our prospects for the remainder of 2004 and thereafter," continued Newman.

52.     On May 4, 2004, more than 3.5 million shares of the Company's stock were traded and the stock closed at $1.26.

53.     On May 7, 2004, the company filed a 10-Q with its financial results for the first quarter of fiscal year 2004. This document was signed by the Individual Defendants, and contained the financial information disclosed in the May 4, 2004, press release.

54.     On June 28, 2004, the Company announced that it "had been added to the Russell 3000(R) Index on June 25 when Russell Investment Group reconstituted its family of 21 U.S. indexes, and that "[m]embership in the Russell 3000, which remains in place for one year, means automatic inclusion for Xybernaut in the small-cap Russell 2000(R) as well as the appropriate growth and style indexes."

55.     In the June 28, 2004, press release, Mr. E. Newman stated that "[b]eing recognized for inclusion in the Russell 3000 and 2000 Indexes marks a significant milestone in our efforts to refocus the Company and also affords us the opportunity to build an even larger institutional following for Xybernaut common stock."

56.     On August 5, 2004, the Company announced its results for the second quarter of fiscal year 2004:

Total revenue for the second quarter of 2004 was $3.4 million, a 21% increase from the comparable 2003 period. Total revenue for the six months ended June 30, 2004 was $7.8 million, a 70% increase from the six months ended June 30, 2003. Beginning with the fourth quarter of 2003 and continuing through the

second quarter of 2004, the Company has now reported its highest three quarterly
revenues ever.

The Company also reported a strong balance sheet. As of June 30, 2004, the
Company had no long-term debt, cash of $13.3 million and stockholders' equity of
$16.5 million.

57.     In the press release for the second quarter results, Mr. E. Newman stated that
"[w]ith revenues up 70%, the value of our intellectual property now being validated and
having just come off the Company's strongest three quarters ever, I am confident that we are
not only on the right track but also that our growth in many areas will now be sharply
accelerating as we move forward."

58.     On August 6, 2004, the company filed a 10-Q with its results for the second
quarter of 2004.  This document was signed by the Individual Defendants and stated the
financial information described in the August 5, 2004 press release.

59.     On November 9, 2004, the Company announced its result for the third quarter
of fiscal year 2004, which ended on September 30, 2004.  The press release announcing the
results stated that "[t]otal revenue for the third quarter of 2004 was $3.2 million, a 20%
increase from the comparable 2003 period. Total revenue for the nine months ended
September 30, 2004 was $11.0 million, a 51% increase from the nine months ended
September 30, 2003."  In the release, Mr. E. Newman stated that "[w]e are well on our way
to our most successful year ever. In fact, our total nine-month revenues have already
surpassed our previous 12-month high," and that:

[t]his top-line growth is the direct result of our continued and successful efforts to
bring in new and larger customers while still maintaining our focus on existing
partners. With our recently announced management team and enhanced corporate

governance initiatives in place, I firmly believe that we are poised to continue to deliver positive results through the rest of 2004, 2005 and beyond.

60.    On November 9, 2004, the Company filed a 10-Q containing its results for the third quarter of fiscal year 2004. This document was signed by the individual defendants, and contained the financial information described in the November 9th press release.

61.    On December 16, 2004, the Company issued a press release regarding its annual meeting, which occurred the previous day. In the press release, Dr. S. Newman stated that "2004 continues to be a banner year for the company as we anticipate continued success moving forward. Our efforts remain focused on enhancing both near and long-term shareholder value."

## THE TRUTH

62.    In January and February of 2005, the stock price of Xybernaut began to decline. On December 31, 2004, it had closed at $1.23 per share, but on February 16, 2005, the stock was trading at $0.85 per share, with more than 8.39 million shares being transferred.

63.    On February 17, 2005, the company issued a press release related to its declining share price. According to the press release, the company knew "of no business reason or financial condition that would explain the decline in its stock price" and "plan[ned] on announcing its fourth quarter and year-end financial results during the week of March 14th or earlier." On February 17, 2005, in response to the company's statement, the Company's stock rebounded to close at $0.92 per share.

64.     On March 14, 2005, less than a month after the announcement that the fourth

quarter and year-end financial results would be filed during the week of March 14th or

earlier, the Company "announced that it ha[d] filed a Form 12b-25 with the Securities and

Exchange Commission and [] received an automatic 15-day extension until March 31, 2005

to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2004." The

Company also stated that it "expect[ed] to complete and file its Annual Report on Form 10-K

by the March 31, 2005 extension date."

65.     On March 31, 2005, after the close of trading, the Company finally issued a

press release indicating the reason for the delay in its filings:

> Xybernaut Corporation (NASDAQ:XYBR) announced today that the filing of its
> Form 10-K and other related reports for the year ended December 31, 2004,
> anticipated to occur today, will be further delayed, pending completion of an
> internal investigation undertaken by its Audit Committee.
>
> On February 28th, the Audit Committee engaged independent counsel - Alston &
> Bird LLP - to assist it in conducting an internal investigation of, among other
> things, concerns brought to the Audit Committee's attention relating to the internal
> control environment of the Company, the propriety of certain expenditures and the
> documentation of certain expenses of the Chairman and CEO of the Company, the
> Company's transparency and public disclosure process, the accuracy of certain
> public disclosures, management's conduct in response to the investigation, and the
> propriety of certain major transactions. The Audit Committee's investigation is
> continuing, and the filing of the Company's 10-K will await the conclusions of
> that investigation. At this time, the Company is unable to predict when its 10-K
> will be filed.
>
> On February 1, 2005, the Company received a subpoena from the Northeast
> Regional Office of the Securities and Exchange Commission, seeking documents
> and other information relating to the sale of Company securities by any person
> identified as a selling shareholder in any Company registration statement or other
> public filing.

As a result of the delayed filing of its Form 10-K, the Company will lose its status
to file registration statements on form S-3, which has historically been utilized to
expedite the registration of common stock issued in connection with the
Company's financings. The loss of the right to use form S-3 could have a material
impact on the ability of the Company to raise additional funds in the future, and
therefore affect its ability to meet its obligations as they come due.

Management is still in process of completing the Sarbanes-Oxley 404 internal
control testing for the year ended December 31, 2004. However, certain material
weaknesses currently have been identified related to the control environment and
control activities as it relates to the Company's policies and procedures in the
expense reimbursement process, revenue recognition related to certain product
sales, and monitoring of business risks. Management continues to evaluate the
identified issues and is addressing remediation plans to be implemented.

Xybernaut also announced unaudited results for the year end December 31, 2004
in addition to 4th quarter results. Revenues for 2004 were approximately $13.9
million, with a net loss of approximately $19.7 million. Revenues for the 4th
quarter were approximately $2.9 million, with a net loss of approximately $7.2
million. These unaudited results do not include possible further adjustments,
including but not limited to, the matters discussed above.

On March 30, 2005 the Company received notice from the NASDAQ Stock
Market that the bid price of the Company's common stock has closed below the
minimum $1.00 per share requirement for the stock's continued listing under
Marketplace Rule 4310(c)(4) (the "Rule). Therefore, the Company has until
September 26, 2005 to become compliant.

66.    On March 31, 2005, before the Company's press release, the Company's stock

closed at $0.42 per share. On April 1, 2005, the Company's stock closed at $0.24 per share,

and more than 33 million shares of Xybernaut stock were traded.

67.    On April 8, 2004, after the close of trading, the company issued another press

release. According to this press release, investors could not rely on any of the Company's

statements during the class period:

Xybernaut Corporation (NASDAQ: XYBRE) announced today that investors and others should refrain from relying upon the Company's historical financial statements, together with the related audit reports the Company received from its outside auditors, Grant Thornton LLP, for the years ended December 31, 2002 and 2003, and interim quarterly reports for the quarters ended March 31, 2003, June 30, 2003, September 30, 2003, March 31, 2004, June 30, 2004 and September 30, 2004.

The Company's action was taken in response to a letter which the Company received from Grant Thornton LLP, on April 6, 2005, indicating that the nature of the items disclosed by the Company in its Form 8 K filed on April 1, 2005, and the uncertainties surrounding the results of the ongoing Audit Committee investigation disclosed in such Form 8-K, have caused the firm to question the accuracy and reliability of the Company's accounting and related disclosures provided in the specified prior period financial statements. The Audit Committee has reviewed the Company's disclosure in this press release and in the Company's related Form 8-K with Grant Thornton LLP.

Upon completion of the Audit Committee's investigation, the Company intends promptly to implement any recommendations resulting from the Audit Committee's investigation and to take any other actions necessary to satisfy the concerns raised by Grant Thornton LLP. The Company has retained Kalorama Partners, LLC, a consulting firm founded by former SEC Chairman Harvey Pitt, to assist the Company in fulfilling these commitments.

The Company also announced today that on April 5, 2005, it received notice from The Nasdaq Stock Market of Nasdaq's intent to delist the Company's securities at the opening of business on April 14, 2005, subject to the Company's right to request a hearing with the Nasdaq Listing Qualifications Panel in accordance with the Marketplace Rule 4800 Series. In the notice, Nasdaq asserted that the Company is in violation of Nasdaq Marketplace Rule 4310(c)(14) because, as the Company previously announced, it has not yet filed its Annual Report on Form 10-K with Nasdaq and the SEC.

68.    On April 11, 2004, the next business day, the Company's stock closed at

$0.13 per share, down from its April 8th share price of $0.19 on April 8. More than 15

million shares of Xybernaut stock were traded on April 11, 2004.

69.    On April 19, the Company issued a press release regarding its internal

investigation:

Xybernaut Corporation (NASDAQ: XYBRE) announced today that its previously disclosed Audit Committee Investigation had been completed and reached the following determinations, among others:

1. The Company's Chairman and CEO, Edward G. Newman, improperly used substantial Company funds for personal expenses and failed properly to substantiate expenses charged to the Company.

2. Members of the CEO's family employed by the Company were hired and evaluated/not evaluated in direct violation of the Company's anti-nepotism policy and constituted a "protected class" of employees.

3. The employment of certain members of the CEO's family was not disclosed in SEC filings as required by SEC disclosure regulations.

4. There has been a lack of adherence to effective disclosure controls governing the Company's public disclosures and the issuance of press releases.

5. Major transactions were entered into by certain members of senior management in violation of Company internal controls. Certain members of senior management failed properly to advise the Board of material financial conditions regarding major transactions.

6. Certain members of senior management failed to disclose to the Audit Committee and the Board  written correspondence by the Company's former Chief Financial Officer outlining serious concerns over the breakdown of internal controls; and

7. Edward G. Newman and Steven A. Newman affirmatively impeded the Audit Committee's investigation in material respects.

In response to the Audit Committee's Report and Recommendations, the Board today approved the following actions:

1. Edward G. Newman was removed as Chairman of the Board and Chief Executive Officer of the Company, and from all other positions he holds with any Company subsidiaries or affiliates.

2. Steven A. Newman was removed as President and Chief Operating Officer of the Company, and Vice Chairman of the Board, and from all other positions he holds with any Company subsidiaries or affiliates.

3. The Board formally requested the resignations of Edward G. and Steven A. Newman as Directors of the Company, but neither individual has agreed to resign from the Board at this time.

4. Retired General William Tuttle was appointed as the Company's Interim Chairman of the Board and Chief Executive Officer, while a search is conducted for new management.

5. The Board authorized the retention of financial experts to assist the Board in maximizing shareholder value.

6. In an effort to promote the independence of the Company's Board, three directors of the Company — James J. Ralabate, Dr. Edwin Vogt and Martin Weisberg, each of whom provides other services for the Company — offered to resign from the Board. The Board determined to defer its acceptance of these offers upon an orderly transition to a new Board.

The Company also announced that Grant Thornton LLP has resigned as the Company's independent auditors. The Company received a letter from Grant Thornton LLP on April 14, 2005, stating that Grant Thornton LLP has concluded that, in its professional judgment, it can no longer rely on management's representations and has resigned as the Company's registered independent accounting firm. On April 8, 2005, the Company advised investors and others that, based upon a letter the Company received from Grant Thornton LLP on April 6, 2005, no reliance should be placed upon certain of the Company's historical financial statements, together with the related audit reports the Company received from its outside auditors. In light of Grant Thornton LLP's resignation, the Company advises investors and others to continue to refrain from relying upon any of the Company's historical financial statements, together with the related audit reports the Company received from its outside auditors, Grant Thornton LLP.

The reports of Grant Thornton LLP on the Company's financial statements for the 2002 and 2003 fiscal years did not contain an adverse opinion or a disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope, or accounting principles. In addition, in connection with the audits of the Company's financial statements for fiscal years 2002 and 2003, and in the subsequent interim periods, there were no disagreements between the Company and Grant Thornton LLP on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure which, if not resolved to the satisfaction of Grant Thornton LLP, would have caused Grant Thornton LLP to make reference to the matter in connection with its report.

However, as noted above, Grant Thornton LLP has now concluded that, in its professional judgment, it can no longer rely on management's representations. After Grant Thornton LLP was advised of the results of the Audit Committee investigation, Grant Thornton LLP advised the Audit Committee's counsel that certain members of senior management failed to disclose facts material to the

financial statements and the weaknesses in the internal controls. The Audit
Committee has discussed the basis for Grant Thornton LLP's conclusion with
Grant Thornton LLP and has authorized Grant Thornton LLP to respond fully to
the inquiries of any successor accountant concerning this subject. The Audit
Committee has reviewed the Company's disclosure in this press release and in the
Company's related Form 8-K with Grant Thornton LLP.

In light of Grant Thornton LLP's resignation as the Company's independent
auditor and the other matters discussed above, the Company is unable to predict
when new auditors will be selected and its Form 10-K will be filed

70.    On April 28, 2005, the company supplemented the announced that it was

redoing its financial statements during the class period:

At this time, the Company is in the process of seeking to engage a new accounting
firm to perform an audit of its financial statements for the fiscal year ended
December 31, 2004. Upon the Company's engagement of an new accounting firm,
the Company will work diligently with such new accounting firm to file its Form
10-K for such period as soon as practicable thereafter. At this time, the Company
can not predict when such filing will be made.

The new accounting firm which the Company engages will also be instructed by
the Company to perform re-audits of the Company's financial statements for the
fiscal years ended December 31, 2002 and 2003, and perform reviews, in
accordance with applicable accounting standards, of the interim periods for the
quarters ended March 31, 2003, June 30, 2003, September 30, 2003, March 31,
2004, June 30, 2004 and September 30, 2004. Upon the conclusion of such re-
audits and reviews, the Company shall file, as may be required, any amended
Form 10-K and Form 10-Q for such periods.

71.    As disclosed by the Company in its March 31st, April 8th, April 19th, and

April 28th announcements, Xybernaut's disclosures during the Class Period, which are

described in the preceding paragraphs, were false and misleading when issued, and

Defendants either made these statements or acquiesced to them the while possessing

contradictory material information.

## DEFENDANTS' DUTIES AND VIOLATIONS

72.    As officers, directors and/or controlling persons of a company whose securities are registered with the SEC and which is therefore subject to the exacting disclosure requirements of the federal securities laws, the Individual Defendants had a duty to:

(a)    promptly disseminate accurate and truthful information concerning the Company; and

(b)    correct any previously issued statements made by them that were materially false or misleading when made.

73.    During the Class Period, the Individual Defendants were privy to confidential and proprietary information concerning Xybernaut, its operations, finances, financial condition, revenues, income, earnings and business prospects. As a result of their possession of such information, each Individual Defendant knew or recklessly disregarded the fact that Xybernaut had materially overstated its financial condition during the Class Period and had not disclosed critical information to the investing public which would have revealed that the Company's prior statements were materially misleading and false. As a result of their Board memberships and/or executive and managerial positions with Xybernaut, each of the Individual Defendants had access to adverse non-public information about the Company's operations, finances, financial condition, products, revenues, expenses and earnings via access to internal corporate documents, conversations and connections with other corporate officers and employees, and via reports and other information, and each of the Individual Defendants knew or recklessly disregarded the fact that the reported and expected financial results of Xybernaut were materially overstated During the Class Period.

-24-

74.    The Individual Defendants, as a result of their positions of control and authority as officers and/or directors of the Company, were able to and did control the contents of the various quarterly reports, SEC filings, press releases and presentations to securities analysts pertaining to the Company. Each of the Individual Defendants was provided with copies of the management reports, press releases and SEC filings described in this Complaint and alleged to be misleading and had the ability and opportunity to prevent their issuance or to cause them to be corrected. As a result, each of the Individual Defendants is responsible for the accuracy of the challenged public reports and releases as "group published" information and is, therefore, responsible and liable for the representations contained in those statements.

75.    Each of the Individual Defendants is liable as a direct participant in, and co-conspirator with respect to, the wrongs complained of in this Complaint. In addition, the Individual Defendants, by reason of their status as officers and/or directors of Xybernaut, had access to material, non-public information, were "controlling persons" within the meaning of Section 20 of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of in this Complaint. As a result of their positions of control, each of the Individual Defendants were able to and did, directly or indirectly, control the conduct of Xybernaut's business, the information contained in its filings with the SEC and public statements about its business.

76.    During the Class Period, Defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to misrepresent the results of Xybernaut's operations, and to conceal adverse material information regarding the

financial condition and results Xybernaut's operations as specified in this Complaint. Defendants employed devices, schemes, and artifices to defraud, and engaged in acts, practices, and the course of conduct described herein in an effort to increase and maintain an artificially high market price for Xybernaut common stock and other securities.  This included the formulation, making and/or participation in the making of untrue statements of material facts, and the failure to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, no misleading, which operated as a fraud and deceit upon Plaintiff and the other members of the Class.

## COUNT I

### VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT AND RULE 10b-5 THEREUNDER

77.     Plaintiff incorporates by reference all of the allegations above.

78.     By engaging in the conduct alleged herein, by the making of false and misleading statements, and by failing to disclose the material facts identified above, Defendants employed devices and artifices, and engaged in a scheme and course of business which was intended to and did act to induce Plaintiff and the members of the Class to purchase Xybernaut securities at artificially inflated prices during the Class Period.

79.     During the Class Period Defendants, individually and in concert, directly and indirectly, engaged and participated in a course of business constituting a plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class.  Defendants knowingly, or in reckless disregard for the truth,

made the materially false and misleading statements alleged herein, and failed to disclose the material facts necessary to make the statements made not misleading

80.    The Individual Defendants, as executive officers and/or directors of Xybernaut, had actual knowledge of the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth by failing to ascertain and disclose the true facts in the statements made by them or other Xybernaut personnel to the SEC and the investing public, including Plaintiff and other members of the Class.

81.    The facts alleged herein compel a strong inference that the Defendants made material false and misleading statements to the investing public with scienter, in that the Defendants knew that the public statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws.

82.    As a result of the foregoing, the market price of Xybernaut securities was artificially inflated during the Class Period. In ignorance of the falsity of the reports and statements, and the deceptive and manipulative devices and contrivances employed by the Defendants, Plaintiff and the other members of the Class reasonably relied, to their detriment, on the reports and statements described above and/or the integrity of the market price of Xybernaut securities during the Class Period in purchasing the Company's securities

at prices which were artificially inflated as a result of the Defendants' false and misleading statements.

83.    Had Plaintiff and the other members of the Class known of the material adverse information, which the Defendants failed to disclose and/or misrepresented, they would not have purchased Xybernaut securities at the artificially inflated prices that they did.

84.    Defendants' dissemination of this false and misleading material information, and their failure to disclose material information that rendered their other statements false and misleading, serve only to harm Plaintiff and the other members of the Class who purchased Xybernaut securities, in ignorance of the financial risk to them as a result of such false and misleading information.

85.    By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and the other members of the Class for the substantial damages which they suffered in connection with their purchase of Xybernaut securities during the Class Period.

## COUNT II

### VIOLATION OF SECTION 20(a)
### OF THE SECURITIES EXCHANGE ACT

86.    Plaintiff incorporates by reference all of the allegations above.

87.    During the Class Period, each of the Individual Defendants, by virtue of his office or offices at, and/or directorship of Xybernaut and his specific acts, was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.

88.    Each of the Individual Defendants' positions provided them with actual knowledge of the material facts that Xybernaut misrepresented and/or concealed from Plaintiff and the other members of the Class during the Class Period.

89.    Each of the Individual Defendants used their power and influence to cause Xybernaut to engage in the unlawful conduct and practices complained of herein by causing the Company to disseminate the false and misleading information identified above.

90.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

91.    By virtue of the conduct described above, Defendants are liable to Plaintiff and the other members of the Class for the substantial damages that they have suffered in connection with their purchase of Xybernaut common stock and other securities during the Class Period.

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays for judgment as follows:

(a)    Declaring this action to be a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all defendants, jointly and severally, for the damages sustained as a result of the wrongdoing of defendants, together with interest thereon;

(c)    Awarding Plaintiff the fees and expenses incurred in this action, including reasonable fees for Plaintiff's attorneys and experts; and

(d)    Granting such other and further relief as the Court may deem just and

proper.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a

trial by jury in this action for all claims against all Defendants.

Dated: May 2, 2005

CHIMICLES & TIKELLIS LLP

Pamela S. Tikellis (#2172)
Robert J. Kriner (#2546)
A. Zachary Naylor (#4439)
Robert Davis (#4536)
One Rodney Square
P.O. Box 1035
Wilmington, Delaware 19899
(302) 656-2500

Attorneys for Plaintiff

OF COUNSEL:

Bruce Murphy, Esq.
265 Llwyds Ln.
Vero Beach, Florida 32963
(772) 231-4202